| | |
|---|---|
| DISTRICT COURT, ADAMS COUNTY, STATE OF COLORADO<br><br>1100 Judicial Center Drive<br>Brighton, CO 80601 | DATE FILED: June 25, 2021 12:24 PM<br>FILING ID: B85E9F7C6CBDB<br>CASE NUMBER: 2021CV30735 |
| **Plaintiff: MARY MENDOZA**<br><br>**v.**<br><br>**Defendants: MIDWOOD BRANDS, LLC** | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>Sean P. Paris #28080<br>Kirsten Z. Myers #51276<br>Austin P. Dominick #55215<br>PEARSON & PARIS, P.C.<br>14142 Denver West Parkway<br>Building 51, Suite 200<br>Lakewood, Colorado 80401<br>Phone: (303) 996-8610<br>Facsimile: (303) 996-8611<br>Email: Sparis@rockymountain-law.com<br>Email: Kmyers@rockymountain-law.com<br>Email: Adominick@rockymountain-law.com | Case No.:  21-CV<br><br>Division: |

## COMPLAINT WITH JURY DEMAND

The Plaintiff, Ms. Mary Mendoza ("Ms. Mendoza"), by and through her attorneys at the law firm of Pearson & Paris, P.C. hereby files this Complaint and Jury Demand and in support hereof states as follows:

### NATURE OF THE CASE

1.      This is a product liability action. Ms. Mendoza brings this action for injuries she sustained, specifically a severed finger, while reasonably and foreseeably using a Family Pet Tie-Out Cable, Heavy Duty (SKU 1130210) (the "Cable") at her home on August 15, 2019.

### PARTIES AND JURISDICTION

2.      Plaintiff Ms. Mendoza, at the time of her injury, resided in Adams County, Colorado at 475 Russell Blvd., Apt. #2C, Thornton, Colorado 80229. Currently, Ms. Mendoza resides in Adams County, Colorado at 501 E. 102nd Ave., #H-204, Thornton, Colorado 80225.

EXHIBIT A

3.      Defendant Midwood Brands, LLC ("Midwood"), which distributed the Cable, is a Virginia Limited Liability Company with its principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320.

4.      Family Dollar Stores of Colorado, Inc. ("Family Dollar – Colorado"), which sold the Cable to Ms. Mendoza, is located in Thornton at 831 E. 88th Ave, Thornton, CO 80229, in the City of Thornton, Adams County, State of Colorado.

5.      This court has general subject matter over this matter pursuant to Colo. Const. Art. VI, sec. 9.

6.      This is a tort action. Plaintiff was injured in Adams County. Moreover, the Cable was purchased in Adams County. Therefore, venue for this action properly lies within Adams County, Colorado pursuant to C.R.C.P. 98(c)(2) and (5).

## GENERAL ALLEGATIONS

7.      SKM Partners, LLC is the parent organization to Dollar Tree Stores, Inc.

8.      Dollar Tree Stores, Inc. is the parent corporation to Family Dollar Stores, Inc.

9.      Family Dollar Stores, Inc. is the parent corporation to Family Dollar – Colorado.

10.      Family Dollar – Colorado is the parent corporation to Midwood.

11.      Midwood is the distributor of the Cable, as indicated on the Cable's packaging.

12.      Family Dollar – Colorado stocks and sells the Cable.

13.      The Cable is exclusively distributed by Midwood to Family Dollar stores, to include Family Store – Colorado.

14.      The Cable, known as "a Family Pet Tie-Out Cable, Heavy Duty," consists of a twenty-foot-long vinyl coated weather-resistant galvanized cable.  Each end of the cable features a spring-loaded metal bolt snap clip with round swivel eye.

15.      The Cable is designed and advertised for use in securing dogs to a particular area by attaching the metal clip to a dog collar and attaching the other end to a stationary object.

16.      Midwood advertises the Cable as a product "for dogs up to 100 pounds."

17.      Midwood advertises the Cable as "tangle resistant with an extra-strong swivel."

EXHIBIT A

18.     Midwood advertises the Cable as a "vinyl-coated, weather-resistant galvanized cable."

19.     Midwood advertises the Cable as "long-lasting and durable."

20.     Midwood provided the following important information on its packaging:

> The tethering of animals may be prohibited or limited in some jurisdictions. Please check state and local laws before using this product. Dogs should be supervised while tied out. This product is not suitable for all dogs. Not recommended for overly active or aggressive pets. Always be sure to provide plenty of fresh water. Owner is responsible for the behavior and safety of their pet and the safety of others. Not intended for children. Be sure to periodically inspect parts for damage or wear.

21.     Ms. Mendoza at all relevant times resided at 475 Russell Blvd., Apt. #2C, Thornton, Colorado 80229, known as the Sunset Peak (the "Apartment").

22.     This Apartment complex is comprised of approximately fifteen (15) buildings with eight (8) units per building.

23.     The area is a semi-residential commercial area located near a hospital.

24.     Ms. Mendoza's particular apartment unit faces Grant Street.

25.     Grant street is a four (4) lane street with a median and a speed limit of thirty-five (35) miles per hour.

26.     Grant street is a semi-busy street with little foot traffic.

27.     The apartment units are similar to townhomes with the main entrances on the ground floor.

28.     The entire apartment complex is set back approximately 50 feet from the street.

29.     Each apartment unit has approximately fifteen (15) feet of an open grassy yard before reaching the apartment complex sidewalk.

30.     The apartment complex has its own sidewalk that goes around each building.

31.     There is approximately thirty-five (35) feet between the street sidewalk and the apartment complex sidewalk.

EXHIBIT A

32.     There is a small retaining wall blocking the street sidewalk from the apartment complex that is approximately three (3) to four (4) feet tall.

33.     Ms. Mendoza has three (3) very large trees blocking her apartment from the street.

34.     Each apartment unit has a small concrete patio about 3 feet wide and 8 feet long in front of the main entrance.

35.     The concrete patio has an air conditioning unit bolted into the back corner of the concrete that is approximately three (3) feet by three (3) feet (3x3).

36.     At all relevant times, Ms. Mendoza had a dog, a forty (40) to fifty (50) pound Labrador mix ("Benji").

37.     Ms. Mendoza routinely wrapped the cable around the A/C unit to tie Benji down.

38.     When Ms. Mendoza wrapped the cable around the 3x3 A/C unit, the cable was shortened by twelve (12) feet, making the twenty (20) foot cable only eight (8) feet long.

39.     When Ms. Mendoza tied Benji down, she ensured that Benji was positioned more than 20 feet from the apartment complex sidewalk.

40.     Ms. Mendoza had been living there for three (3) years.

41.     Ms. Mendoza is a fifty (50) year old female.

42.     Ms. Mendoza at the time of the incident weighed approximately 170 pounds.

43.     According to section 13-25-102, C.R.S., Ms. Mendoza's life expectancy at the time of the incident was 37.9 years.

44.     Ms. Mendoza is right hand dominate.

45.     Ms. Mendoza has Multiple Sclerosis (MS) which leaves her with diminished strength and ability to pull.

## SPECIFIC ALLEGATIONS

46.     In March 2019, Ms. Mendoza visited Family Dollar – Colorado and purchased the Cable.  She paid approximately $7.04.

47.     Benji is a medium sized dog.

EXHIBIT A

48.     Benji is a very friendly dog who does extremely well with children and people.

49.     Benji is not an aggressive dog.

50.     Benji is not an overly active dog.

51.     Ms. Mendoza regularly used the Cable to confine Benji to the front yard of her apartment complex.

52.     When Ms. Mendoza confined Benji to the front yard, she wrapped the twenty-foot cable around the A/C unit, which is bolted to her cement patio, and used the bolt snap swivel clip to hook it to the cable.

53.     The other end of the cable and bolt snap swivel clip attached to Benji's collar.

54.     On August 15, 2019, Ms. Mendoza tethered Benji to the front yard of her apartment complex using the Cable.

55.     During that day, Benji began to bark at a man walking down the apartment complex sidewalk and started moving in his direction with the extra lead from the Cable.

56.     Seeing this, Ms. Mendoza grabbed the Cable to prevent Benji from straining the Cable or pulling the cable off the air conditioning unit, and to prevent further barking.

57.     In an effort to grab and secure the Cable, Ms. Mendoza wrapped the Cable around her hand once and then once around her right index finger.

58.     Ms. Mendoza pulled the Cable and Benji back towards the middle of the yard to prevent further barking.

59.     Ms. Mendoza was met with resistance from Benji and as a result, the Cable tightened around Ms. Mendoza's index finger.

60.     Ms. Mendoza received an extremely deep gash to her right index finger.

61.     Immediately after the incident, Ms. Mendoza went to North Suburban Medical Center located at 9191 Grant Street, Thornton, CO 80229.

62.     Dr. Edward Loran Farrell, M.D. was Ms. Mendoza's Primary Care Physician at North Suburban Medical Center.

63.     Dr. Deterri Dawn Rockwell, P.A.C. was Ms. Mendoza's initial authorizer at North Suburban Medical Center.

EXHIBIT A

64.     Dr. Pramod Vangeti, M.D. was the last signatory on Ms. Mendoza's medical records.

65.     Dr. Edward Loran Farrell, Dr. Deterri Dawn Rockwell, and Dr. Pramod Vangeti (the "Doctors") diagnosed Ms. Mendoza with a dislocated Distal Interphalangeal Joint ("DIPJ") and a laceration that cut deep down to the tendons and bone circumferentially around the index finger.

66.     The doctors referred Ms. Mendoza to Dr. Kelley Wear, M.D. with the Hand Center, and Dr. Zilke, M.D a limb preservation specialist with Presbyterian Saint Luke's.

67.     Dr. Kelley Wear and Dr. Zilke concluded that Ms. Mendoza was a poor candidate for replantation and revascularization.

68.     Specifically, on August 16, 2019, Dr. Kelley Wear with the Hand Center advised Ms. Mendoza that the end of her index finger was not viable for revascularization and a revision amputation was necessary to prevent further amputation and infection of the index finger.

69.     On August 19, 2019, Dr. Wear amputated Ms. Mendoza's index finger at the distal phalanx of her right index finger.

70.     Ms. Mendoza incurred medical expenses in the amount of $15,584.76.

71.     Ms. Mendoza endured significant pain during the initial injury and the following amputation surgery.

72.     Ms. Mendoza currently endures pain as a result of the injury and amputation.

73.     Ms. Mendoza experiences a shooting pain in her right hand and finger.

74.     Ms. Mendoza has numbness and tingling in her index finger.

75.     Ms. Mendoza's right hand and fingers now cramp, limiting mobility and causing pain.

76.     Ms. Mendoza is experiencing painful phantom limb sensations in her right index finger.

77.     Ms. Mendoza's other fingers on her hand ache, feel bruised, and cramp.

78.     Ms. Mendoza's right hand now feels like someone is consistently applying a large amount of pressure to a severe bruise.

79.     Ms. Mendoza now has a feeling of persistent painful arthritis in her right hand.

EXHIBIT A

80.     Ms. Mendoza's ongoing pain in her right hand has further limited its functionality.

81.     The bones in Ms. Mendoza's finger ache to such an extent it causes consistent cramping in the remainder of her right hand and three (3) fingers, specifically the middle finger, ring finger, and pinky finger.

82.     Ms. Mendoza may require ongoing medications, such as nonsteroidal anti-inflammatory drugs or antispasmodic medication to control her pain symptoms.

83.     The estimated future medical expense for medication is $60.00 annually.

84.     As a result of the injuries Ms. Mendoza sustained, she has a permanent physical impairment.

85.     The amputation is an obvious deformity, visible to the public.

86.     The injury is embarrassing and uncomfortable, causing Ms. Mendoza stress and anxiety.

87.     Ms. Mendoza struggles performing simple day to day functions.

88.     Ms. Mendoza struggles buttoning a shirt.

89.     Ms. Mendoza struggles typing on a computer.

90.     Ms. Mendoza struggles writing a letter.

91.     Ms. Mendoza has been forced to adapt to using her thumb and other fingers.

92.     Ms. Mendoza no longer has full strength or use of her right hand.

93.     Ms. Mendoza almost completely avoids using her right index finger as it consistently feels numb and tingly.

94.     The injury caused Ms. Mendoza emotional distress and anxiety.

95.     The injury has impaired Ms. Mendoza's quality of life.

96.     Ms. Mendoza now has a permanent disfigurement.

## **FIRST CLAIM FOR RELIEF**
### *Strict Product Liability – Failure to Warn*

EXHIBIT A

97.   Ms. Mendoza incorporates all allegations contained in the Complaint as if fully set forth herein.

98.   Pursuant to section 13-21-401, C.R.S. "[i]f jurisdiction cannot be obtained over a particular manufacturer of a product…then that manufacturer's principal distributor…over whom jurisdiction can be obtained shall be deemed, for the purposes of this section, the manufacturer of the product."

99.   Upon information and belief, the manufacturer of the Cable is based out of The People's Republic of China.

100.  Midwood is the distributor of the Cable.

101.  Midwood exclusively distributes the Cable to Family Dollar.

102.  Midwood distributes the Cable to Family Dollar in a sealed, clear, plastic container such that no individual or entity in the chain of distribution can alter the Cable in any form prior to purchase by a consumer.

103.  Family Dollar sells the Cable in the same condition and does not remove the packaging of the Cable prior to purchase by a consumer.

104.  Ms. Mendoza is an individual consumer who purchased and used the Cable.

105.  When Ms. Mendoza purchased the Cable, there was no noticeable damage to the product or packaging. purchased it with the original packaging still intact such that there were no rips or tears in the seams of the packaging.

106.  The Cable reached Ms. Mendoza without substantial change in condition from which it was distributed.

107.  At all relevant times, the packaging did not warn consumers of the potential injuries that could result from use of the Cable, to include, tightening the cable around one's hand or fingers.

108.  Ms. Mendoza used the Cable in a foreseeable manner.

109.  It is foreseeable that a consumer would grab the Cable with his or her hand or fingers to control, direct, or pull the dog while tethered to the Cable.

110.  The Cable has an unreasonably dangerous defect that injured Ms. Mendoza as a user and consumer of the Cable.

EXHIBIT A

111.  At all relevant times, Ms. Mendoza used the Cable as intended, i.e., to tie up her dog Benji to a solid stationary object, the A/C unit bolted into the concrete patio in the front yard of her apartment complex.

112.  At all relevant times, Ms. Mendoza supervised Benji while he was tethered outside.

113.  Ms. Mendoza acted for the safety of her dog Benji and the safety of others.

114.  At all relevant times, it was reasonably foreseeable that Ms. Mendoza would grab and pull on the Cable to aid her in controlling Benji and prevent barking.

115.  Ms. Mendoza suffered physical harm when her right index finger was amputated as a result of using the Cable.

116.  Specifically, the Cable caused Ms. Mendoza's injury when it wrapped around her right index finger and caused a deep gash requiring amputation.

117.  Midwood designed, manufactured, and distributed a Cable that was defective.

118.  Midwood owed a duty of reasonable care to warn about potential harm and dangers when using the Cable.

119.  Similar tie-out cable products have amputated fingers of consumers in the market such that Midwood in the exercise of reasonable care should know that the Cable is potentially and foreseeably harmful and injurious to a consumer and or user.

120.  Midwood neglected to give any warning about potential injuries.

121.  Midwood neglected to give any instructions for use of the Cable.

122.  At all relevant times, Midwood's packaging did not warn consumers of the potential injuries that could result from tightening the cable around one's hand and or fingers.

123.  At all relevant times, Midwood provided inadequate warnings concerning the hazards or proper methods for safe use of the Cable.

124.  Midwood's Cable packaging merely states:

> "For dogs up to 100 IBS; Tangle-resistant, extra-strong swivel; vinyl-coated, weather-resistant galvanized cable; long-lasting and durable.
>
> **Important Information:** The tethering of animals may be prohibited or limited in some jurisdictions. Please check state and local laws before

EXHIBIT A

using this product. Dogs should be supervised while tied out. This product is not suitable for all dogs. Not recommended for overly active or aggressive pets. Always be sure to provide plenty of fresh water. Owner is responsible for the behavior and safety of their pet and the safety of others. Not intended for children. Be sure to periodically inspect parts for damage or wear." *See* Packaging of Tie-Out-Cable, Exhibit 1.

125.  Midwood's "Important Information" is an inadequate warning of the danger when using the Cable.

126.  It is reasonably foreseeable that a consumer would wrap the Cable around one's hand and fingers to control one's dog.

127.  It is reasonably foreseeable for a consumer to pull on the Cable to control one's dog.

128.  It is reasonably foreseeable for a dog to pull on the Cable either when the dog is attached to a stake or when being reined in by his or her owner.

129.  It is reasonably foreseeable that a dog pulling on the Cable will increase pressure on the Cable wrapped around one's hand.

130.  Midwood did not advertise or warn of the risk of amputated fingers.

131.  Midwood did not warn about any potential injury.

132.  The plastic vinyl coating invites an individual to grab the Cable and hold onto it.

133.  It is not obvious that the Cable could cause physical harm to the individual including an amputated finger, soreness, broken finger, etc.

134.  The risk of limb loss is not obvious or ordinary to a reasonable consumer and or user.

135.  Ms. Mendoza used the Cable in a way that it was intended to be used.

136.  Ms. Mendoza used the Cable in a manner which could reasonably have been expected and was injured while doing so.

137.  The Cable creates an unreasonable danger to the user or consumer.

138.  Ms. Mendoza has incurred numerous expenses in treating her injury caused by Midwood's Cable.

EXHIBIT A

139.  As such, Ms. Mendoza has been damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### *Strict Product Liability – Design Defect*

140.    Ms. Mendoza incorporates all allegations contained in this Complaint as if fully set forth herein.

141.    Ms. Mendoza used the Cable in a foreseeable way.

142.    It was reasonable for Ms. Mendoza to grab the Cable and wrap Cable around her hand to rein in Benji.

143.    At no point could Ms. Mendoza have anticipated that her use of the Cable would result in a deep laceration to her finger necessitating the amputation of her DIPJ.

144.    As a result of the Cable's design, the DIPJ of Ms. Mendoza's right index finger was amputated when she used the Cable to rein in her dog.

145.    The Cable is unreasonably dangerous in its design.

146.    The danger the Cable creates is inherent to the design itself.

147.    The design of the Cable creates an unreasonable risk of harm.

148.    As a result of the unreasonable dangerousness of the Cable design, Ms. Mendoza has undergone various medical treatments and suffers from continued and prolonged pain because of her amputated finger.

149.    Ms. Mendoza has been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIF
### *Negligence*

150.    Ms. Mendoza incorporates all allegations contained in this Complaint as if fully set forth herein.

151.    Midwood as the distributor of the Cable owed duties to Ms. Mendoza to provide her with instructions for use, warn her of potential dangers, and distribute a Cable that is safe for consumer use.

EXHIBIT A

152.     Midwood breached its duties to Ms. Mendoza by distributing the Cable that resulted in the severance of Ms. Mendoza's finger because it failed to provide a safe Cable or warn of potential injury.

153.     Midwood's breach of duty of care caused Ms. Mendoza's injury when part of her right index finger was amputated as a result of using the Cable.

154.     But for Midwood's Cable, Ms. Mendoza would still have her entire right index finger.

155.     But for Midwood's Cable, Ms. Mendoza would not have been harmed.

156.     Midwood materially contributed to Ms. Mendoza's injury.

157.     Ms. Mendoza's injury was caused by Midwood's Cable, while the Cable was being used in a manner Midwood should reasonably have expected.

158.     Midwood's Cable was the actual and proximate cause of Ms. Mendoza's injury.

159.     The injury Ms. Mendoza sustained required medical treatment, including treatment from specialists as well as surgery, as a result of Midwood's negligence.

160.     Ms. Mendoza did not cause or contribute to her injury.

161.     Ms. Mendoza sought immediate medical attention to mitigate her damages.

162.     As a result of Midwood's negligence, Ms. Mendoza is now permanently disabled.

163.     As a result of Midwood's negligence, Ms. Mendoza is now permanently disfigured.

164.     Ms. Mendoza will have future medical expenses to treat her pain.

165.     Ms. Mendoza will suffer future economic and non-economic damages, including inconvenience, loss of enjoyment of life, and mental anguish in an amount to be determined at the time of trial.

166.     Midwood is liable for negligence in the injuries caused by its Cable, to include mental anguish, pain and suffering, medical related expenses both past and future, disability, and disfigurement.

167.  As such, Ms. Mendoza has been damaged in an amount to be determined at trial.

EXHIBIT A

168.  Ms. Mendoza reserves the right to amend the Complaint as additional information through the course of discovery is received.

WHEREFORE, Ms. Mendoza requests:

(1) Entry of judgment in favor of Ms. Mendoza and against Defendant Midwood Brands, LLC;

(2) An award of all damages incurred by Ms. Mendoza during and after the date of the injury;

(3) An award of damages to Ms. Mendoza for her past economic losses, medical expenses, future medical expenses, non-economic losses, and permanent impairment losses incurred by her during and after the date of the injury;

(4) An award of damages to Ms. Mendoza for her actual out of pocket, economic and non-economic losses incurred by her during and after the date of the injury;

(5) Money damages for pain and suffering;

(6) Money damages for impairment of quality of life;

(7) Money damages for permanent disfigurement;

(8) An award of all pre- and post- judgment interest;

(9) An award of costs and fees for bringing this action; and

(10)     Such other and reasonable relief as the court deems appropriate and just.

## JURY DEMAND

The plaintiff hereby demands a jury of six (6) to try all issues of fact.

EXHIBIT A

Respectfully submitted this 25th day of June, 2021.

**PEARSON AND PARIS, P.C.**

*/s/Kirsten Z. Myers*
Kirsten Z. Myers, #51276
*Attorney for Plaintiff*

*/s/Austin P. Dominick*
Austin P. Dominick, #55215
*Attorney for Plaintiff*

Plaintiff's address:
501 E. 102nd Ave., #H-204,
Thornton, Colorado 80225

EXHIBIT A